UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

LEONARD EDWARD SMITH,   )
            )
   Petitioner,    )
            )
v.            )  No. 2:13-CV-132-JRG-MCLC
            )
BRUCE WESTBROOKS, Warden,[1] )
            )
   Respondent.   )

## MEMORANDUM OPINION

Acting pro se, Leonard Edward Smith ("Petitioner"), an inmate in the Riverbend Maximum

Security Institution in Nashville, Tennessee, brings this petition for a writ of habeas corpus under 28

U.S.C. § 2254, challenging the legality of his confinement under a Hamblen County, Tennessee

judgment convicting him of two counts of first degree felony murder [Doc. 2]. For these two

offenses, Petitioner received a life term and the death penalty [*Id*. p.1]. Respondent Warden has

submitted an answer to the petition, which is supported by copies of the state court record [Docs.

14-16, 20, Attachments 1-12]. Petitioner has not replied to the Warden's answer, and thus the case

is ripe for disposition.

In his answer, Respondent argues that the petition is untimely under the statute of limitation

in 28 U.S.C. § 2244(d) as it pertains to Petitioner's conviction and the life sentence imposed for the

murder of the first victim, John Pierce, and that, while the petition is timely with respect to the

murder of the second victim, Novella Webb, the claims raised in connection with this conviction

---

[1] The Court has substituted Bruce Westbrooks for Wayne Carpenter, the originally-named Respondent, since Warden Westbrooks, Petitioner's current custodian, is the correct respondent (Tennessee Department of Correction, State Prisons, Riverbend, *see* online at https://www.tn.gov/correction/article/tdoc-riverbend-maximum-security-institution (Internet materials as visited Sept. 22, 2016)). *See* Rule 2, Rules Governing Section 2254 Cases.

have been procedurally defaulted, are insufficiently pled, are groundless, or alternatively, may also be untimely [Doc. 14 pp. 5, 10-16].

Respondent's argument with respect to the timeliness of claims involving the Pierce murder is sound; his position with regard to the timeliness of claims pertaining to the Webb conviction is not supported by the law.

## I.     PROCEDURAL HISTORY

In 1984, Petitioner, his girlfriend, Angela O'Quinn, and his friend, David Hartsock, robbed two small grocery stores in rural Sullivan County, Tennessee. Petitioner and O'Quinn waited in Petitioner's car while Hartsock entered the first store, Malone's Grocery.   During the course of the robbery, Hartsock shot and killed John Pierce. The three proceeded to the second store, located near the Carter–Sullivan County line, which was owned and operated by Novella Webb and her husband. Both Hartsock and Petitioner entered the store.   During this robbery, Petitioner, who was armed with a .32 caliber pistol, shot and killed Mrs. Webb. Petitioner was charged with two counts of first degree murder for the killings of Pierce and Webb. The offenses were joined for trial, and, at Petitioner's request, venue for the trial was changed from Sullivan County to Hamblen County.

Petitioner was convicted on both counts of first degree felony murder. At the conclusion of the proof, the State withdrew its notice of intent to seek the death penalty with respect to the Pierce murder, and the state trial court imposed a life sentence.  The jury imposed a capital sentence for the Webb murder.

On direct appeal, the Tennessee Supreme Court ["TSC"], affirmed Petitioner's life sentence for the Pierce murder conviction, but reversed his conviction and death sentence for the Webb murder and remanded the case for a new trial.  *State v. Smith*, 755 S.W.2d 757 (Tenn. 1988) ("Smith I"). At the retrial for the Webb murder, Petitioner again was convicted of first degree felony murder

2

and sentenced to death. On Petitioner's second direct appeal, his conviction was affirmed, his death penalty was vacated once again, and the case was remanded for a third sentencing hearing. *State v. Smith*, 857 S.W.2d 1 (Tenn. 1993) ("Smith II"). At this resentencing, which occurred in 1995, Petitioner received a death sentence, which was affirmed by the Tennessee Court of Criminal Appeals ["TCCA"], *State v. Smith*, No. 3C01-9512-CC-00383, 1997 WL 607498 (Tenn. Crim. App. Oct. 3, 1997), and by the TSC. *State v Smith*, 993 S.W.2d 6 (Tenn. 1999) ("Smith III"). On November 29, 1999, the United States Supreme Court rejected the petition for a writ of certiorari. *Smith v. Tennessee*, 528 U.S. 1023 (1999).

On December 17, 1999, Petitioner filed a pro se state petition for post-conviction relief, challenging his conviction and death sentence in the Webb murder. *Smith v. State*, 357 S.W.3d 322, 334 (Tenn. 2011). On May 10, 2001, the petition was amended to add claims involving the Pierce murder, though Petitioner acknowledged that his conviction and sentence for the Pierce murder had become final in 1988. *Id*. The post-conviction court denied relief, and Petitioner appealed.

On appeal, the TCCA affirmed the lower state court's ruling with respect to the Pierce murder claims, finding that the claims were barred by the post-conviction statute of limitation, upheld Petitioner's conviction for the Webb murder, and vacated the death sentence issued at the 1995 resentencing proceeding. *Smith v. State*, No. E2007-00719-CCA-R3PD, 2010 WL 3638033, at *17, * 47 (Tenn. Crim. App. Sept. 21, 2010), *aff'd in part, vacated in part*, 357 S.W.3d 322 (Tenn. 2011).

When the post-conviction appeal was carried to the highest state court, the TSC affirmed the TCCA's finding that the post-conviction claims in the Pierce case were barred by the statute of limitation, affirmed Petitioner's conviction in the Webb murder, but again vacated the death sentence and remanded the case for yet another resentencing hearing. *Smith v. State*, 357 S.W.3d

3

322, 334 (Tenn. 2011). The State declined to seek a death sentence on remand, and Petitioner was sentenced to a life term, which was set to be served consecutively to the life sentence imposed for the Pierce murder [Doc. 2 p.24; Doc. 16, Addendum 12].

Thereafter, Petitioner filed this instant petition for a writ of habeas corpus [Doc. 2].[2]

## II.    HABEAS CORPUS RULE 2(e)

In his answer, Respondent argues that Petitioner has failed to comply fully with the filing requirements set forth in Rule 2 of the Rules Governing Section 2254 Cases. In support of this argument, Respondent maintains that Petitioner has used this single petition to attack both felony murder convictions, though the judgment with respect to the Webb murder conviction was vacated during the post-conviction appeals, leaving intact only the Pierce murder conviction and sentence. Respondent further maintains that federal district courts properly have dismissed petitions challenging multiple judgments entered in more than one court or have severed federal challenges to separate state-court judgments, where those challenges are filed in a single § 2254 petition. Even so, Respondent suggests that the goal of judicial efficiency is best served by jointly disposing of all claims involving both the Pierce and Webb felony murder cases which are raised in the instant petition.

Rule 2(e) of the Rules Governing § 2254 Cases states that "[a] petitioner who seeks relief from judgments of more than one state court must file a separate petition covering the judgment or

---

[2] Petitioner filed a previous habeas corpus petition in the Middle District of Tennessee, alleging that his continued confinement on death row after his capital sentence had been set aside constituted cruel and unusual punishment [Doc. 16, Addendum 11]. Because the petition did not challenge the fact or duration of Petitioner's confinement, the district court found that it did not fall within the scope of federal habeas review and denied the petition [*Id.*]. Since the previous habeas corpus petition was not a true habeas corpus petition, within the terms of the statute, the present § 2254 petition does not constitute a second or successive petition which must be transferred to the Sixth Circuit for authorization for this Court to consider it.

4

judgments of each court." *Id*. Thus, Rule 2(e) "permits, but does not require, an attack in a single petition on judgments based upon separate indictments or on separate counts even though sentences were imposed on separate days by the same court." Rule 2(d) advisory committee note 1976 adoption (Subdivision (e) was formerly Subdivision (d)).

Under the provisions in Rule 2(e), this attack on a judgment entered by the Hamblen County Criminal Court, convicting Petitioner for two counts of first degree felony murder, is properly filed in a single petition, even though the state court ultimately entered a life sentence when the death sentence for the Webb murder, as issued in the original 1985 judgment, was set aside. *See Hardemon v. Quarterman*, 516 F.3d 272, 276 (5th Cir. 2008) ("We hold that under former Rule 2(d), [petitioner] was permitted, but not required, to challenge his separate convictions in a single § 2254 petition."); *Henderson v. Bunting*, No. 1:14CV2557, 2015 WL 196058, at *1 (N.D. Ohio Jan. 14, 2015) ("[I]t would appear that [petitioner] is not barred from presenting challenges to two separate state convictions in a single petition for habeas corpus.") (citing to *Hardemon*); *Johnson v. Norris*, No. 5:08CV00279 JMM, 2009 WL 88915, at *3 (E.D. Ark. Jan. 12, 2009) (noting that a habeas petitioner is not precluded from challenging more than one conviction in a § 2254 petition so long as the convictions arise from the same state court).

Nevertheless, the Court has the discretion to sever the claims stemming from the Pierce murder from those arising from the Webb murder. *See* Rule 12, Habeas Corpus Rules (providing that the Federal Rules of Civil Procedure, if not inconsistent with Habeas Corpus Rules, may be applied to § 2254 cases); *Cosgrove v. Rios*, No. 7:08-CV-109-KKC, 2008 WL 4410153, at *3 (E.D. Ky. Sept. 19, 2008) (applying Federal Rule of Civil Procedure 21, sua sponte severing two sets of claims from a single § 2241 petition, creating separate petitions, then addressing the remaining claims in the original petition). However, under the circumstances presented in Petitioner's case,

5

the Court agrees with Respondent's suggestion that the interest of judicial efficiency is best advanced by resolving jointly all claims presented in this petition. Therefore, the Court will not sever the claims involving the Pierce murder from those based on the Webb killing.

Because the claims relative to the Pierce murder are more easily resolved, the Court first turns to Respondent's statute-of-limitation defense with respect to those claims.

### III. THE PIERCE MURDER

On May 10, 2014, Petitioner brought this instant § 2254 petition, challenging the convictions and sentencings for both the Pierce and the Webb murders. Respondent's answer asserts that the claims arising from the Pierce murder are untimely under the statute of limitations governing the filing of federal petitions for a writ of habeas corpus.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2241, amended the federal habeas corpus statutes and added a one-year statute of limitations to regulate the time for filing an application for a federal writ of habeas corpus. In the typical case, the statute of limitations begins to run from the date a petitioner's state judgment of conviction becomes final. *See* 28 U.S.C. § 2244(d)(1)(A).

Here, the TSC affirmed Petitioner's conviction and life sentence for the Pierce murder on August 1, 1988. Petitioner's conviction became final ninety-one days afterwards, or on October 31, 1988, upon the lapse of the period of time during which he could have sought a writ of certiorari in the United States Supreme Court. *See* U.S. Sup. Ct. R. 13.1 (providing a ninety-day time frame for petitioning for a writ of certiorari, running from the date of the decision of the state court of last resort).[3] Because Petitioner's conviction became final on October 31, 1988, prior to the date of

---

[3] Because the ninetieth day fell on a Sunday, the period for filing the petition was extended to Monday, which was "the end of the next day that is not a . . . Sunday." U.S. Sup. Ct. R. 30.1.

6

enactment of the AEDPA on April 24, 1996, his time for filing a § 2254 petition would have expired one year from the date the AEDPA was enacted. *Searcy v. Carter*, 246 F.3d 515, 517 (6th Cir. 2001); *Brown v. O'Dea*, 187 F.3d 572, 577 (6th Cir. 1999), *vacated on other grounds by Brown v. O'Dea*, 530 U.S. 1257 (2000).

However, the statute also provides a tolling mechanism. The statute is tolled under § 2244(d)(2) during the time "a properly filed application for State post- conviction or other collateral review" is pending.

The AEDPA limitations period began to run in Petitioner's case on April 24, 1996, and would have expired on April 24, 1997, unless it was stopped by the pendency of a properly filed post-conviction petition in state courts. Petitioner's state post-conviction petition, filed in the trial court on December 17, 1999, cannot serve to toll § 2244(d)(1)'s limitation period because, by the time the state collateral proceedings were initiated, the AEDPA's clock had already stopped and there was no time left to toll. *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) ("The tolling provision does not . . . 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations."); *Hargrove v. Brigano,* 300 F.3d 717, 718 n. 1 (6th Cir. 2002).

Furthermore, only a "properly filed" state petition for collateral review triggers the AEDPA's statutory tolling mechanism. 28 U.S.C. § 2244(d)(2). The Supreme Court has ruled "that time limits, *no matter their form*, are 'filing' conditions, and that a state postconviction petition is therefore not 'properly filed' if it was rejected by the state court as untimely." *Allen v. Siebert*, 552 U.S. 3, 6 (2007) (emphasis in original) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005)) (some internal quotation marks omitted). The TSC held that Petitioner's "petition for post-

7

conviction relief in the Pierce case is barred by the [state post-conviction] statute of limitations."
*Smith*, 357 S.W.3d at 355.

Although the AEDPA statute of limitation is not jurisdictional and is subject to equitable tolling, *Holland v. Florida*, 560 U.S. 631, 645 (2010), there is nothing alleged by Petitioner and nothing apparent in the record to suggest a basis for equitable tolling of the limitation period.

Therefore, the Court **FINDS** that all claims involving the Pierce murder which are asserted in this habeas corpus petition are time-barred under § 2244(d)(2). They are **DISMISSED**.

## IV. THE WEBB MURDER

Respondent also asserts that the claims predicated on the Webb murder are likewise untimely under § 2244(d)(2). Respondent posits that the judgment for the Webb murder conviction and sentence became final on November 29, 1999, following the Supreme Court's denial of certiorari. Respondent points out that Petitioner filed his state post-conviction petition on December 17, 1999, which, according to Respondent, stopped the AEDPA's one-year clock after it had run eighteen days. The clock remained stopped until December 19, 2001, the date on which the TSC issued its decision affirming the Webb conviction and remanding the case for resentencing. The next day, according to Respondent, the clock resumed ticking and ran for three hundred, forty-seven (347) days, before stopping on November 30, 2012. Respondent maintains that, in line with this reasoning, the instant § 2254 petition, which was filed on May 10, 2013, comes to the Court five months too late. Respondent espouses this position, despite the fact that Petitioner's criminal judgment at that point in time consisted only of a conviction since the sentence of death had been vacated. The Court rejects Respondent's reasoning and finds that the habeas corpus claims involving the Webb murder case are timely and not precluded by the AEDPA statute of limitation.

8

In *Burton v. Stewart*, 549 U.S. 147 (2007) (per curiam), the Supreme Court entertained the question of whether a § 2254 petition, filed after a previous petition, constitutes a second or successive petition, requiring authorization by the appropriate court of appeals. The Supreme Court turned first to the statutory text of § 2244(d)(1)(A), which provides that the limitations period that applies to "a person in custody pursuant to the judgment of a State court" runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id*. at 156.

Holding that the "[f]inal judgment in a criminal case means sentence. The sentence is the judgment," the Supreme Court concluded that the *Burton* petitioner's limitations period did not commence until both his conviction and sentence became final. *Id*. at 156-57 (citing *Berman v. United States*, 302 U.S. 211, 212 (1937); *see Flynt v. Ohio*, 451 U.S. 619, 620 (1981) ("Applied in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence."); *Rashad v. Lafler*, 675 F.3d 564, 568 (6th Cir. 2012) (finding that, under *Burton*, the AEDPA limitations statute did not begin to run on a resentencing which occurred more than ten years after the state court vacated the sentence until "after direct review of the new sentence"); *cf. Baker v. State*, 989 S.W.2d 739, 741 (Tenn. Crim. App. 1998) (determining that the state post-conviction statute of limitation does not begin to run until thirty days after resentencing where no notice of appeal is filed).

*Burton* and *Rashad* involved a resentencing that occurred as a result of state direct review proceedings. Even so, those rulings apply when a state prisoner's resentencing results from state post-conviction review. *King v. Morgan*, 807 F.3d 154, 159 (6th Cir. 2015) (observing that "[t]he entry of a new judgment normally resets the statute-of-limitations clock"); *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1293 (11th Cir. 2007) (applying *Burton* and calculating the limitation

9

period from the time of resentencing because the "judgment is based on both the conviction and the sentence"); *Hess v. Ryan*, 651 F. Supp. 2d 1004, 1020-21 (D. Ariz. 2009) (noting that a habeas corpus petition attacks the "validity of whatever judgment currently holds the petitioner" rather than attacking trial errors in one judgment and resentencing errors in another judgment) (listing cases).

Accordingly, under the above line of decisions, the AEDPA limitations statute did not begin to run on the Webb murder conviction until the time expired for Petitioner to file a direct appeal of his November 16, 2012, Hamblen County judgment resentencing him to a life term [Addendum 12]. Since Petitioner did not file a notice of appeal in the state court within thirty days of that judgment, *see* Tenn. R. App. P. 4(a) (allowing thirty days to file a notice of appeal with respect to a criminal judgment), the one-year AEDPA clock began to run with respect to the Webb murder case on December 17, 2012, and it was still ticking on May 10, 2013, when Petitioner filed this § 2254 petition.

Thus, all claims relating to Petitioner's conviction and sentence on the Webb murder are timely. *King*, 807 F.3d at 158 (holding that "the new judgment will reinstate the conviction and the modified sentence" so that "the existence of a new judgment permits a new application to attack the sentence, the conviction, or both").

**A. Background**

The facts surrounding Petitioner's convictions were recited by the TCCA in its opinion on direct review.

> On the afternoon of May 21, 1984, a witness, Orville Malone, heard a sound similar to a firecracker in the vicinity of Malone's store and he observed an unidentified young man running out of the store. He then saw the storekeeper, Mr. John Pierce, appear on one knee in the doorway of the store and fire two shots. The fleeing male got into an automobile that was across the bridge behind the store and the

10

automobile left the scene. Mr. John Pierce was then found, apparently dead, just inside the doorway of the store with a gun by his side. It was the opinion of the pathologist who performed the autopsy that Mr. Pierce's death was caused by a single gunshot wound to the abdomen.

Later that same afternoon, witness Robert Glover observed two young men drive up to Webb's Grocery in a "green looking" Pinto automobile. These two young men got out of the vehicle, one of them spoke to Mr. Glover, and then entered the store. A moment or two later Mr. Glover heard two loud noises from inside the store, and he walked to the entrance and opened the screen door. One of the individuals inside the store told him that he had better not come in if he knew what was good for him. Mr. Glover then ran to the road and stopped a passing motorist, Charles Webb. Mr. Glover testified that the two young men ran from the store to their vehicle. He identified the defendant Smith at trial as one of the two who had entered the store.

Witness Charles Webb testified that he observed two unidentified young men run from the store, "hop in a car and take off." Another witness, Tommy Trivette, travelling behind Charles Webb, testified that he observed two young men walking slowly out of the store and that they "appeared to be smiling." Witness Trivette identified the defendant Smith at trial as one of the two men he observed leaving the store. He further testified that when he entered the store Mr. Webb stated that he had been robbed.

Mrs. Novella Webb was found inside the store lying on the floor behind the counter. The pathologist who performed the autopsy testified that her death was caused by a single gunshot wound that entered her face at the right nostril, at an upward angle of fifteen or twenty degrees, lodging inside the rear portion of the brain. He further testified that she was unconscious within seconds and that there was no chance of saving her life.

Gladys Sheets testified that on the evening of May 22, 1984, she drove the defendant Smith and the co-defendants Hartsock and O'Quinn to Johnson City and that they threw a gun out of the car. She testified that the defendant Smith gave O'Quinn some money and that she and O'Quinn purchased back packs, blankets, shoes and hats at a K–Mart store. Then they purchased food at a Giant Food Market and purchased gas and cigarettes at a service station with the money that the defendant had given her. They then drove to her sister-in-law's house in a rural section of Johnson County, Tennessee, where she left them.

Mike Gardner, the Sheriff of Sullivan County, testified that on May 21, 1984, he investigated a shooting at Malone's Grocery Store located on Highway 19E in Sullivan County. While he was there he received a call concerning another shooting at Webb's Grocery on Hickory Tree Road, also in Sullivan County. On May 22, 1984, the investigation of these shootings led to three suspects, the defendant Smith, David Hartsock and Angela O'Quinn. These three were arrested at daybreak on May 23, 1984, at a secluded house in Johnson County and were returned to Sullivan County.

Doctor Leland Blake, a clinical pathologist, testified that he performed an autopsy on the body of John Pierce and determined that the cause of death was a gunshot wound to the abdomen from which he removed a thirty-two caliber bullet. He also testified that he performed an autopsy on the body of Novella Webb and determined the cause of death to be a gunshot wound to her head. He also removed a thirty-two caliber bullet from her body.

Keith Carr, a detective employed by the Sullivan County Sheriff's Department, testified that he investigated the shooting at Malone's Grocery Store at approximately 5:30 p.m. on May 21, 1984. On his arrival he saw Mr. John Pierce lying in the doorway. While he was at Malone's Grocery Store he was dispatched to Webb's Grocery Store approximately five miles from Malone's. Upon arrival at the Webb's Grocery Store he observed a tremendous amount of disarray inside the store and blood stains behind and beside the counter. The body of Mrs. Webb had already been removed when he arrived. He testified that he observed an indentation in the wall directly behind the cash register.

Following the arrest of defendant Smith, Detective Carr interviewed him at the jail and obtained the following statement which he read to the jury, to wit:

> I, Leonard Edward Smith, am giving this statement of my own free will and without any threats or promises being made to me. On Monday, May 21, 1984, I was with my girlfriend Angie O'Quinn and David Hartsock and we went and got some liquor and went to a road near the Sullivan–Carter County line. We parked and were just drinking and talking and smoked some joints. While we were on that road in my black Ford Pinto which I had painted black because it used to be orange, David said "Get out, I want to talk to you." He and I got out and walked a ways from the car where Angie

12

couldn't hear us talking and David said, "I can get us a little bit of money down here at this store." He said, "It is the store down at the county line," and I asked him if it was Shorty Malone's and he said, "Yes." Angie and I drove David down there, and let him off a little ways from the store. I parked on the little paved road beside the store. David had a thirty-two caliber chrome plated pistol with him. The pistol was his pistol. I heard several shots fired and just a few seconds later David came running around the store. David jumped into the car and said, "Get the hell out of here, I had to shoot him." I figured it was Shorty because he ran the store. We drove out the road that goes behind the side of Malone's Grocery, and it dead ends, and you can turn left to the Watauga area or right back to Sullivan County. We turned onto the Watauga Highway and drove to what is known as Mountain Road. I asked David if he shot the man, and he said that he shot him one time and the man pulled a gun and started shooting at him. I don't remember if he said what money he got. I drunk some more liquor, and made Angie get out of the car. I started driving and was just going to drive us out of the mountain. We came out at some store, and I turned left, and drove until I realized I was going to [sic] wrong way, and I pulled in at Webb's Store to turn. I stopped the car at Webb's and David jumped out, and I ran in the store behind him. David ran and jumped on the counter, and knocked the old man over and yelled to me, "Get that bitch" referring to an old woman at the end of the counter. I started towards her, and she started throwing things at me and started spraying paint on me. I fired one shot just to scare people, but the old woman just kept spraying orange paint and came towards me. I couldn't see because of the paint and I held the gun up and apparently the old lady was trying to get the gun away from me and it went off. We ran from the store when I fired the second shot. I didn't really know that I had shot her until we heard it later on the news. When we were in Webb's Store the old man was hollering, "Help me, help me," and hollering for his wife. The old woman never did say anything that I remember. I know that before we left the store, some man came up to the door, and I told him to get out of there. I didn't get any money from either store, and David didn't say if he did or not.

13

David and I left Webb's and went back up towards Mountain Road, and picked Angie up. I told her we had to get out of there, and we drove down towards Underwood Park, and set the car on fire. David cut a hose next to the carburetor and set the car on fire. David and Angie and me took off on the trails, and really didn't know which way to go. We came out at a house on Indiana Creek. It was the Johnson residence because my dad had sold them the house. We didn't go to the house until late last night, and Angie got Gladys Sheets to take us to the home where we were arrested this morning. I had never been to the house before but had been in the area. When Gladys drove up to Dennis Cove, she said she thought we did it. I had taken my shirt and wrapped my feet so I could walk and I think I left it in Gladys' car or at the house. Gladys had told us that Mrs. Webb, and the man at Malone's were both dead. We told Gladys that we didn't do it and she said, "If you didn't, you better keep the gun because the news said it was a thirty-eight" and she knew we had a thirty-two caliber. I told David to throw the gun out anyway because I knew we had done it. He threw it out as we went over a bridge, and we drove on up to the house. We stopped at a grocery store, and Angie and Gladys went in and got some food for us to take to the house. We fixed something to eat, went to sleep, but I felt like they knew where we were at. I had cut mine and David's hair with a pair of scissors Angie had in her pocketbook because I knew they would be looking for somebody with longer hair. This morning I heard a loud noise, and I knew we were caught then. I told Angie I was going out, and you come out too, so we won't get hurt. Somebody had yelled for us to come out, and David went out first. All I know is that everything didn't turn out the way it was supposed to, and it shouldn't have happened. I am sorry for what happened, because I know I am a thief, but I don't think of myself as a murderer. This is all I know to tell you about what happened.

Carr obtained a hair sample from defendant Smith and observed that his hair had been cut close and nearly shaved at the time of his arrest.

Robert Denny, an agent of the Tennessee Bureau of Investigation, testified that pursuant to information he had received he located a

14

burned vehicle and an abandoned campsite on Holston Camp Mountain in Sullivan County. He testified that in scraping the paint off the vehicle he found brown and orange layers of paint.

Deputy Sheriff Keith Elton testified that when he arrested the defendant Smith he removed an unspent thirty-two caliber cartridge and twenty-seven cents in change from the defendant's person.

John Young, an officer with the Sullivan County Sheriff's Department, testified that subsequent to the defendant's arrest he found a handgun at a railroad crossing located between Elizabethton and Johnson City. He removed six unspent cartridges from the gun.

Gladys Sheets, a friend of defendant Smith and Angela O'Quinn, testified that at about 7:00 p.m. on May 22, 1984, O'Quinn came to her home and said that the defendant wanted the witness to take him to Kathy's. The witness testified that she was scared because the police had been there earlier. She testified that David Hartsock came up and all three of them got in her car. The defendant came out of the woods and got into the back seat. The witness drove them along the back roads to Johnson City with the defendant giving her directions. When the witness told the defendant Smith he ought to get rid of the gun, he replied, "You're right," and threw it out on a railroad bridge. The witness testified that she had seen the same pistol a couple of weeks before. They proceeded to the K–Mart in Johnson City and the defendant gave O'Quinn some money. The witness and O'Quinn went inside and purchased some camping equipment. The defendant stayed in the car. They then drove to the Giant Food Market where the two women bought groceries. They then proceeded to a service station where the defendant gave the witness some money for gas and cigarettes. The group then proceeded to a dirt road in Johnson County where the witness let the defendant Smith, O'Quinn and Hartsock out with the items they had purchased. The witness testified that the hair of both the defendant and Hartsock was short when she saw them that day.

William Albrecht, a special agent with the F.B.I., and a firearms identification expert, testified that the bullet removed from John Pierce's body was fired from the gun which Officer Young found at the railroad crossing. He testified that the bullet removed from Novella Webb's body was a thirty-two caliber bullet but that it was so mutilated he could not determine the rifling characteristics. He testified that the pistol was in working condition when he examined it. He testified that the gun did not have a hair trigger and could not have been fired by merely dropping it on the floor.

15

Chester Blythe, a special agent with the F.B.I. and a microscopic analyst, testified that hair taken from the campsite on Holston Mountain in Sullivan County matched Hartsock's hair sample but did not match the defendant's sample.

John Riley, a special agent with the F.B.I., testified that the bullet recovered from Novella Webb, the six unspent cartridges found in the pistol, and the one unspent cartridge found in the defendant's pocket all originated from the same box of ammunition.

Robert Webb, a special agent with the F.B.I., testified that the pistol contained particles of paint consistent with a can of spray paint found at the shooting scene in Webb's Grocery.

Katy Mahoney, the daughter of Worley and Novella Webb, testified that she determined that seventy-five dollars was missing from the store after the robbery and killing.

*Smith*, 755 S.W.2d at 659-7622010 WL 457496, at *1–4. On this evidence, the jury convicted Petitioner of first degree felony murder for the killing of Mrs. Webb.

### B. Discussion

Petitioner raises three main claims regarding the Webb murder in his petition: (1) ineffective assistance of counsel in the pre-trial motions, trial, and appeal in connection with the 1985 murder conviction; (2) ineffective assistance of counsel in the pre-trial motions, trial and appeal of the 1989 murder conviction; and (3) prosecutorial misconduct during the guilt phase closing argument.

The Warden argues, in his response, that relief should not be granted because Claim 1 has been procedurally defaulted and is meritless; because Claim 2 is meritless, in that some sub-parts were adjudicated on the merits by the state court, culminating in a decision that cannot be disturbed, given the deferential standards of review set forth in 28 U.S.C. § 2254, and in that other sub-parts are insufficiently pled and otherwise defaulted; and because Claim 3 has been procedurally defaulted also.

16

The Court agrees with Respondent Warden as to the granting of relief and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

## 1. Claim 1 - Ineffective Assistance (1985 Conviction)

In this claim, Petitioner alleges that he received ineffective assistance from counsel throughout the various stages of the 1985 criminal judicial proceedings against him. However, as Respondent asserts, the TCCA held that

> [b]oth the conviction and death sentence imposed for the Webb murder by the 1985 jury and the death sentence imposed for the Webb murder by the 1989 jury were long ago reversed by the supreme court. Thus, any challenges to the Webb conviction or death sentence arising from the proceedings that already have been reversed cannot possibly provide a basis for relief from the Petitioner's 1989 conviction and 1995 death sentence for the Webb murder.

*Smith v. State*, No. E2007-00719-CCA-R3PD, 2010 WL 3638033, at *21 (Tenn. Crim. App. Sept. 21, 2010), *aff''d in part, vacated in part*, 357 S.W.3d 322 (Tenn. 2011).

Claims based on a conviction that has been vacated are moot. *See generally, Sibron v. New York*, 392 U.S. 40, 57 (1968) (observing that "a criminal case is moot [where] it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction"). Because Petitioner's 1985 conviction and death sentence for the Webb murder have been reversed, as the TCCA noted in the above excerpt, it is clear that he will suffer no collateral legal consequences from a conviction which has been vacated and which is no longer subject to being challenged.

Because there is no case or controversy with respect to the 1985 Webb murder conviction or death sentence, *see* U.S. CONST. art. III, § 2, cl.1, Claim 1, in its entirety [Doc. 2 pp. 27-28] is **DISMISSED** for lack of jurisdiction.

17

## 2.   Claim 2 - Ineffective Assistance (1989 Conviction)

Petitioner asserts that, in five instances, he received ineffective assistance through the pre-trial, trial and appellate stages of his 1989 conviction. Respondent asserts that, with the exception of the claim that counsel gave him ineffective assistance on appeal,[4] all the ineffective-assistance claims were adjudicated by the state court and that the resulting decision was not contrary to or an unreasonable application of well-established principles in Supreme Court cases.

### a.  Standards of Review

### i.  Adjudicated Claims

Under the review standards set forth in the AEDPA, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular

---

[4]  Respondent contends that Petitioner's claim of ineffective assistance by appellate counsel has been insufficiently pled and also procedurally defaulted.

facts of the case. *Id*. at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id*. at 411.

The AEDPA standard is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). AEDPA prevents the use of "federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Furthermore, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### ii. Ineffective Assistance

To prevail on a claim of ineffective assistance, a petitioner must show that a deficient performance on the part of counsel resulted in prejudice to his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688. Petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Thus, it is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

When considering prejudice, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A

19

reasonable probability "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

Finally, petitioners who assert claims of "ineffective assistance of counsel under *Strickland* have a heavy burden of proof." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). "[W]hen a federal court reviews an ineffective-assistance claim brought by a state prisoner, the question is not simply whether counsel's actions were reasonable, 'but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

### b. The Claims

#### i. Voir Dire

In this claim of ineffective assistance, Petitioner maintains that counsel failed to conduct a proper voir dire of Juror Morris Bagwell and that counsel's failure resulted in a conviction which violated Petitioner's rights under the Sixth and Fourteenth Amendments. Respondent argues that the state court's adjudication of the claim did not result in a decision that is either contrary to or an unreasonable application of well-established principles in controlling Supreme Court cases.

When presented with this claim, the TSC cited to *Strickland* among other cases and employed its two-part analysis for ineffective assistance of counsel claims. *Smith v. State*, 357 S.W.3d 322, 337, 348 (Tenn. 2011). Thus, the TSC's conclusion relative to this claim and all the other claims of ineffective assistance it reviewed under *Strickland* is not contrary to the well-established legal rule in Supreme Court cases governing these types of claims. *See Cullen*, 563 U.S. at 189 (observing upon review of an ineffective assistance claim that "[t]here is no dispute that the clearly established federal law here is *Strickland v. Washington*").

20

Petitioner maintained in the TSC that counsel failed to question potential jurors about their past experiences either as a victim of crime or being associated with a victim of crime and this failure resulted in the seating of a juror, Morris Bagwell, whose daughter's boyfriend had been murdered the year prior to the trial. Petitioner argued in the state court that there was a presumption that Juror Bagwell was biased and that the bias on the part of this juror was prejudicial to the outcome of the trial.

The TSC noted that the transcript showed that the prospective jurors were not questioned, either by counsel or the trial court, about whether they or someone close to them had ever been the victim of a crime. Counsel testified at the post-conviction evidentiary hearing that they had not had a strategic reason not to ask those questions. Juror Bagwell testified as to the profound impact the murder of his daughter's boyfriend had had on him and his family and stated that, while he did not voluntarily disclose the information, he would have done so had he been asked.

The TSC observed that a criminal accused has a right to a fair trial by an impartial jury, that voir dire is designed to ensure that jurors are unbiased and impartial, that potential bias may arise where a juror has been involved with a crime similar to the one being tried, and that, unless there is a showing of a strategic reason, "the failure to ask prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." *Smith v. State*, 357 S.W.3d at 347. However, the TSC rejected Petitioner's invitation to presume prejudice under the circumstances surrounding the seating of Juror Bagwell and found that Petitioner had failed to introduce any evidence of actual bias. Pointing out that Juror Bagwell recalled during his testimony that he had told the trial judge that there was no reason he could not give Petitioner a fair trial, the TSC held that Petitioner was not prejudiced by the deficient performance.

The Constitution protects a criminal accused's right to a fair trial, which is effectuated, under the Sixth Amendment, by impaneling a jury of impartial, "indifferent" jurors who render a verdict based on evidence adduced at the trial. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To show that an accused has not been tried by an impartial jury, a petitioner had the affirmative duty to establish "the actual existence of [an opinion as to the merits of a case] in the mind of the juror." *Id.* at 724. To prevail on a biased juror claim, a petitioner bears the burden of showing actual bias, to wit, that "the ability of the particular jury that heard the case to adjudicate fairly" was compromised. *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) (observing that where counsel is alleged to have provided ineffective assistance by failing to strike a biased juror, the petitioner "must show that the juror was actually biased against him") (citing *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)).

A petitioner can show actual bias by showing that a juror had a fixed opinion about guilt and could not lay aside his opinion and render a verdict based on the evidence presented in court. *Irvin*, 366 U.S. at 723. Allowing even one biased juror to sit at a trial violates a defendant's Sixth Amendment right to a jury free of bias. *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)).

Here, the TSC's determination that Petitioner did not present any evidence of actual bias—a factual finding based on the TSC's review of the record—must be afforded a presumption of correctness, absent any clear and convincing evidence to the contrary. *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Matta*, 449 U.S. 539, 546-47 (1981)). Petitioner has offered no such clear and convincing evidence. Because there was no evidence of actual bias and, hence, no constitutionally viable claim that Petitioner was denied his right to an impartial jury, no prejudice ensued from counsel's failure to raise the biased-juror claim.

22

The TSC did not unreasonably apply *Strickland* in rejecting this claim of ineffective assistance, and habeas corpus relief is unwarranted.

### ii.    Expert Witnesses

Petitioner maintains that, at the time of the crime, he suffered from post-traumatic stress disorder and brain damage and that he was intoxicated and was incapable of forming the requisite intent to commit first degree felony murder, so testified witnesses at the post-conviction hearings. Even so, according to Petitioner, counsel failed to investigate the case and retain appropriate expert witnesses to establish Petitioner's intoxication and diminished capacity as defenses to first degree murder. Presentation of these defenses, so Petitioner asserts, would have "compelled a jury to return a verdict of second degree murder or manslaughter" [Doc. 2 p.29].

When presented during Petitioner's post-conviction appeal, the claim was discussed extensively by the TCCA, which held that "[c]ontrary to the position taken by the Petitioner in his brief, the evidence presented to the post-conviction court demonstrated that [counsel] exhaustively investigated the Petitioner's background and social history prior to the 1989 retrial and uncovered evidence supportive of his present claim that he 'was brain-damaged, intoxicated, suffering from the effects of post-traumatic stress disorder, and incapable of forming the requisite intent to commit first degree felony murder.'" *Smith v. State*, 2010 WL 3638033, at *26.

The TCCA detailed that evidence, which included three pre-trial mental evaluations in 1984—two in June and one in November—to determine Petitioner's competency to stand trial. Testimony from the clinical psychologist who performed one of the evaluations established that Petitioner agreed to participate only if the tests administered to him were "quick and fast," that no evidence of brain damage was found based on Petitioner's performance on the psychological tests, and that the evaluation team had been aware of his long history of drug abuse.

23

Counsel testified that they obtained a part-time investigator to assist in securing mitigating evidence and the services of a clinical neuropsychologist and that they supplied these defense experts with background material on Petitioner that they felt might be relevant and necessary to the experts' evaluation of the issues and of Petitioner. The neuropsychologist related, in her testimony at the post-conviction hearing, that Petitioner's problems were most likely attributable to brain damage, caused in part by his long history of drug and alcohol abuse, and opined that he would have inordinate difficulty resisting the temptations of alcohol and/or drug abuse and might impulsively overreact to stressors, especially if he were intoxicated.

Counsel further testified that part of their defense strategy had been to show that Petitioner was intoxicated at the time of the Webb murder and that they knew of Petitioner's participation in a drug treatment program during a prior incarceration in the Tennessee prison system. Counsel also theorized that the information involving their client's drug and alcohol treatment would be useful as mitigation evidence, but that it likewise could be harmful to the jury's perception of Petitioner.

The TCCA, citing to a 1996 decision issued by the TSC, recognized that a "defendant's mental condition can be relevant and admissible in certain cases to rebut the *mens rea* element of an offense," and that one of those "certain cases" involved an offense of felony murder, as the TCCA itself had held in 1999. However, the TCCA noted that it was not until 1994 that the law was clarified in Tennessee as to the admissibility of expert testimony involving diminished capacity to form the requisite *mens rea* and ultimately concluded that counsel could not have rendered ineffective assistance for failing to pursue this line of defense in a case tried before the law was settled.

*Strickland* instructs reviewing courts to evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors rather than viewing those claimed errors in hindsight. *Strickland*, 466 U.S. at 690. Because the law allowing the inclusion of

24

expert testimony relative to a diminished capacity defense to rebut the mental element of a felony murder offense was not the law in Tennessee at the time of counsel's supposed error, the TCCA's application of *Strickland* to trial counsel's representation was objectively reasonable and furnishes no basis for relief. *See Williams*, 529 U.S. at 409 (finding that a "unreasonable application" of clearly established federal law" is one that is "objectively unreasonable").

    **iii.**    **Motions to Suppress**
    **iv.**    **Failure to Support Motions with Testimony**

Petitioner maintains that, despite the fact that he peacefully surrendered to law enforcement officers who swarmed the cabin where he and his girlfriend were staying following the Webb murder, he was beaten and intimidated to the point that he feared that he would be killed. Counsel took a photograph showing the imprint of a shotgun on Petitioner's back but failed to prepare and argue adequately motions challenging Petitioner's illegal arrest, detention and interrogation by the Sullivan County Sheriff's Department. Moreover, counsel failed to offer testimony stating that the imprints he saw on Petitioner's back were consistent with a shotgun barrel imprint.

When this issue was carried to the TCCA during the post-conviction appeal, the TCCA recounted that counsel had testified at the post-conviction evidentiary hearing that he "could not say why he did not, either at the initial suppression hearing or when the suppression issue re-emerged prior to the 1989 retrial, introduce the photographs into evidence or testify himself regarding the injuries he had observed on the Petitioner's back." *Smith v. State*, 2010 WL 3638033, at *35.

This evidence, as assessed by the TCCA, established the mere fact that, immediately after his arrest, Petitioner had marks on his back, which his counsel viewed as being consistent with having been made by the barrel of a shotgun. The TCCA went on to conclude that it would have made no difference if the evidence had been offered at the suppression hearing, in view of the detailed proof

25

adduced at the suppression hearing and found sufficient by the TSC to support that Petitioner's statement had been voluntary and not coerced. *Id.* (citing *State v. Smith*, 755 S.W.2d 757, 762-63 (Tenn. 1988)).

Statements given voluntarily, without coercion, are admissible into evidence. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Based on the finding that Petitioner's statement was voluntary and not coerced, which finding in turn was based on detailed testimony given at a suppression hearing describing the circumstances surrounding the confession, results in a conclusion that no prejudice ensued from counsel's failure to testify that Petitioner's back displayed marks believed by counsel to be consistent with a shotgun barrel. The Court agrees that there is no reasonable probability that, but for counsel's failure to present speculative testimony as to the source of marks he observed on Petitioner's back, the motion to suppress would have been granted. Accordingly, the TCCA's decision rejecting these two alleged attorney errors as meritless was not an unreasonable application of *Strickland*. *Hurley v. United States*, 10 F. App'x 257, 261 (6th Cir. 2001) (mere speculation will not support a claim of a deficiency on the part of counsel); *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009) (finding that an argument which relies on speculation "is not sufficient to establish prejudice").

### v. Motion to Suppress (appeal)

In the next claim of ineffective assistance, Petitioner maintains that counsel failed to include a number of meritorious arguments on appeal of the denial of the motion to suppress his confession with respect to his 1985 Webb murder conviction. While pointing out that these claims are supported by no allegations of fact and, thus, are insufficiently pled, Respondent has interpreted Petitioner's allegations as mistakenly identifying the conviction being appealed as the 1985 Webb murder conviction, which subsequently was overturned, rather than the 1989 Webb murder conviction which

26

still stands. Respondent takes the position that the claim, even so interpreted, was not raised as an attorney error in Petitioner's post-conviction appeal of the 1989 conviction and that the failure to do so constitutes a procedural default.

As Respondent correctly maintains, Petitioner has failed to elaborate on the arguments which counsel neglected to make and likewise has failed to identify the legal authorities which purportedly would have supported those arguments, had counsel researched and developed the underlying issues.

Thus, Petitioner's presentation of this claim does not comply with the rules governing habeas corpus petitions. Rule 2(c) of the Section 2254 Rules provides, in pertinent part, that the petition must "(1) specify all the grounds for relief available to the petitioner; [and] (2) state the facts supporting each ground." Notice pleading is not permitted in habeas petitions. *Blackledge v. Allison*, 431 U.S. 63, 75-76, n.7 (1977). A constitutional claim which is not clothed with facts is conclusory and does not merit relief. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991).

Based on the finding that this claim is insufficiently pled and does not comply with Rule 2(c) of the Section 2254 Rules, the Court will not address Respondent's alternative argument that the claim has been procedurally defaulted.

### C.     Claim 3 – Prosecutorial Misconduct

In the final claim, Petitioner asserts that the State committed prejudicial misconduct during closing argument at the guilt-innocence phase of his 1989 Webb murder trial [Doc. 1 pp.30-31]. Respondent counters that the claim has been procedurally defaulted, in that the state court deemed it waived due to Petitioner's failure to present the claim in earlier proceedings.

The claim was raised in the TCCA in Petitioner's post-conviction appeal brief, but the TCCA held that the issue was waived due to his failure to object to the prosecutor's closing argument at the trial or to present the claim during his direct appeal. *Smith*, 2010 WL 3638033, at

Where a petitioner has actually presented his federal claim to the state courts but those courts have declined to address it due to his failure to meet a state procedural requirement, that claim is subject to a finding of procedural default. *See, e.g., Murray v. Carrier*, 477 U.S. 478 (1986).

When a state invokes a procedural default defense, a court in the Sixth Circuit must determine whether: (1) there is a procedural rule which applied to a petitioner's claim and whether a petitioner complied with the rule; (2) the procedural rule was actually enforced against a petitioner; (3) that rule is an adequate and independent state ground sufficient to block habeas review; and (4) a petitioner can demonstrate cause for his failure to comply with the rule and prejudice resulting from the alleged constitutional violation. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Beuke v. Houk*, 537 F.3d 618, 630 (6th Cir. 2008) (applying *Maupin*).

Tennessee has a rule providing that an issue presented in a post-conviction petition is waived if not raised in an earlier proceeding where it could have been raised. *See* Tenn. Code Ann. § 40-30-106(g). The TCCA applied this rule to Petitioner's claim. Tennessee's waiver rule is an adequate and independent state ground sufficient to foreclose habeas review. *Hutchison v. Bell*, 303 F.3d 720, 738 (6th Cir. 2002). No cause and prejudice has been shown, or even alleged, and this claim is barred from federal habeas corpus review by Petitioner's procedural default.

## V.     CONCLUSION

For the above reasons, this pro se state prisoner's application for a writ of habeas corpus will be **DENIED** and this case will be **DISMISSED**.

## VI.     CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA). A petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be

28

issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). A petitioner whose claims have been rejected on a procedural basis must demonstrate that reasonable jurists would debate the correctness of a court's procedural rulings. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). Where claims have been dismissed on their merits, a petitioner must show that reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484.

After having reviewed the claims and in view of the law upon which is based the dismissal on the merits of the adjudicated claims and the procedural basis upon which is based the dismissal of the remaining claims, reasonable jurors would neither debate the correctness of the Court's procedural rulings nor its assessment of the claims. *Id*. Because reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), the Court will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

**AN APPROPRIATE ORDER WILL ENTER**.


                                           _____
                                                 s/J. RONNIE GREER
                                         UNITED STATES DISTRICT JUDGE